CORA  SQUIER  JONES,  Respondent,  v.  THE . BARBER  ASPHALT  PAVING  COMPANY, Appellant.

Kansas City Court of Appeals, October 6, 1913.

1. TAX BILLS: Preliminary Resolution: Implication of Law. When the preliminary resolution for paving a public street, and the plans and specifications to which it refers, are silent on the subject of grading, the law will imply a duty on the part of the city to furnish a graded street to the contractor and a property owner would not be justified in thinking that the burden of such duty was included in the work proposed by the resolution.

2. ———: ———: Specification of Time in Contract.   The failure of an ordinance to fix the time for the completion of the paving of a street does not invalidate the ordinance and the tax bills issued in payment of such work are not void because of long delay in letting the contract for the doing of

the work, if the contract was in compliance with the ordinance and the work was done and completed in compliance with the contract.

3. ———: ———: **Condition Precedent.** Where the charter and ordinances of Kansas City, in force at the time a resolution is passed to pave a street, does not make the filing of a preliminary estimate of the cost of the improvement a condition precedent to the enactment of the ordinance for the improvement, or the letting of the contract, then the tax bills issued for such improvement are not void because of the failure to file such preliminary estimate.

4. ———: ———: **Guaranty to Repair.** Where a contractor breaches his guaranty to keep the pavement in good repair, he becomes liable on his bond to respond in damages, but such a breach could not affect the validity of the tax bills issued in payment of the cost of the pavement.

Appeal from Jackson Circuit Court.—*Hon. Jas. H. Slover,* Judge.

REVERSED.

*Scarritt, Scarritt, Jones & Miller* for appellant.

*Gage, Ladd & Small* for respondent.

JOHNSON, J.—This is a suit in equity commenced in the circuit court of Jackson county on March 28, 1908, to cancel certain special tax bills issued by Kansas City, May 24, 1905, in payment of paving Troost avenue from the south line of Thirty-eighth street to the south line of Forty-seventh street. A trial of the issues raised by the pleadings resulted in a judgment for plaintiff in accordance with the prayer of the petition and the cause is here on the appeal of defendant.

Point is made by defendant that plaintiff is not the owner of the property against which the tax bills in question were issued and, therefore, cannot maintain this action, but in the view we take of the case it will not be necessary to discuss that question and we

shall treat plaintiff as the owner of the property which abuts on Troost avenue between Thirty-eighth and Fortieth streets as the proper party to prosecute this action.

The city council enacted an ordinance in 1900, establishing the grade on Troost avenue between Thirty-ninth and Forty-seventh streets. Before the thoroughfare came under the jurisdiction of the city it was a county road and had a macadam roadway. The ordinance made important changes in the grade and at various places between Thirty-ninth and Forty-seventh streets the old macadam was on a grade substantially different from that established by the ordinance. Shortly before the proceedings in controversy were initiated the street railway company extended the double tracks of its Troost avenue line south to Forty-seventh street and laid them to conform to the new grade.

On November 2, 1903, a petition for the paving was filed with the city engineer and on the same date the lower house of the common council passed a resolution "declaring the work of paving Troost avenue from Thirty-eighth street to Forty-seventh street to be necessary." The resolution provided: "The street to be paved the full width thereof, exclusive of sidewalks of legally established width and that part legally required to be paved by the street railway company operating thereon, with a genuine Trinidad Lake asphalt pavement to conform in all respects to detail "Q" of asphalt pavements, approved by the board of public works August 28, 1896, except there shall be macadam foundation of eight (8) inches in thickness, upon such foundation shall be laid a binder course one and one-half (1½) inches in thickness and upon said binder course shall be placed an asphalt wearing surface one and one-half (1½) inches in thickness, the matrix of which shall be composed of genuine Trinidad Lake asphalt. Said pavement to be constructed

of such material and in such manner that the same shall endure without the need of any repairs for a period of ten (10) years from the completion thereof. The total cost of said pavement not to exceed the sum of two dollars ($2) per square yard."

This resolution which was formally approved by the board of public works, passed the upper house November 9, 1903, went into effect on that date, and was duly published.

On November 2, 1903, an ordinance was passed in the lower house to grade Troost avenue, the full width thereof from Thirty-eighth street to Forty-seventh street "and to the established grade of the same." The ordinance passed the upper house November 9th and was approved by the mayor November 16, 1903. The contract to do the grading under this ordinance was let July 12, 1904, the grading was completed at a cost of $8000, and was paid for in special tax bills. The grading covered the full width of the street inclusive of sidewalk spaces and brought the entire street to the established grade.

On December 21, 1903, and pursuant to the resolution we have noted, an ordinance was enacted "to pave Troost avenue from the south line of Thirty-eighth street to the south line of Forty-seventh street." It provided that "the street shall be paved the full width thereof exclusive of all sidewalks," that "the work and improvements shall consist of a genuine Trinidad Lake asphalt pavement to conform in all respects to 'detail Q' of asphalt pavement approved by the board of public works, August 28, 1896," that "the total cost of said pavement shall not exceed the sum of two dollars per square yard," that "the work shall be paid for in special tax bills against and upon the lands that may be charged with the cost thereof according to law," and that "the contract . . . shall guarantee that the same shall be constructed with such materials and in such manner that the same shall en-

dure without the need of any repairs for the period of ten years from and after its completion." It was further provided that the contractor should give a bond securing the performance of the contract. No time for the beginning and completion of the work was stated. The passage of the ordinance was formally recommended by the board of public works. The contract for the paving under this ordinance first was advertised to be let April 4, 1904, but there was no bid. Again, it was advertised to be let July 21, 1904, and on that date the defendant made the only bid but no contract was entered into. Finally the letting was advertised for August 30, 1904, and the contract was let to defendant on its bid to do the work at two dollars per square yard. This was done after the completion of the grading of the street.

The contract, which was confirmed by the council September 12, 1904, contained detailed specifications of the work and also by express provision made the "plans and specifications on file in the office of the city engineer relating to the work herein contemplated . . . a part of this contract and specifications." Referring to "detail Q" the contract provided that "the pavement shall consist of macadam foundation already in place upon the street and sufficient new macadam so as to bring the surface when thoroughly compacted to within three inches of the established grade and cross section of the street." As to the time of doing the work it was stipulated that work "be commenced within ten days from the time the contract binds and takes effect . . . and completed . . . within ninety days after the date of confirmation;" that "in case the contractor shall fail to complete all the work herein contemplated, in accordance with the terms of these specifications, within ninety (90) days as aforesaid, the city engineer shall deduct from the aggregate amount due according to the considerations of this contract an amount equal to ten (10) dollars

per day for each and every working day after said ninety (90) days that the work is not completed as aforesaid.'' That ''no allowance will be made for additional time for the completion of this contract unless the contractor shall be delayed or restrained from prosecuting the work, or any and every part thereof, or unless the time is extended by the passage of an ordinance by the common council for the number of days stated in such ordinance,'' and that ''the days work on this contract lost in consequence of injunctions or court proceedings, bad weather, grading, curbing, trenching, by other contractors, corporations or individuals, over whom the party of the first part has no control, organized general strikes, or burning of any plant where the materials for this contract are manufactured or made, shall be added to the number of days specified in this contract within which work shall be completed.''

The work was not completed in the time specified in the contract but before the expiration thereof (Dec. 12, 1904) the city, on the petition of defendant, extended the time by ordinance to June 1, 1905, the cause stated in the ordinance being ''sewer along street from Thirty-eighth street to Forty-seventh street.'' It does not appear that the passage of this ordinance was recommended by the board of public works. The work was completed within the time provided in the extension ordinance and according to the plans and specifications.

''Detail Q'' to which reference was made in the resolution and ordinance for the paving was one of the details of a general plan for paving upon an old macadam base which was approved by the board of public works on August 28, 1896, and since that date had been on file in the office of the city engineer. It was a blue print on which was drawn general and detailed plans for the laying of a new pavement of either asphalt or brick on old macadam. A general cross

section of such repavement was shown followed by five detailed plans lettered respectively "N. Q. P. R. and O." The first three referred to asphalt pavements, the last two to vitrified brick. Specifications were written on the blue print and those relating to "detail N" provided: "The pavement shall consist of the macadam foundation already in place upon the street and sufficient new macadam so as to bring the surface when thoroughly compacted to within 3½ inches of the established grade and cross section of the street.

"Subgrade—The space over which the pavement is to be laid will be excavated to a depth of at least 3½ inches below the established grade and cross section of the street. Should there be any soft or disintegrated material in the bed thus prepared all such material will be removed and the spaces thus excavated, as well as all holes and irregularities found or excavated below the proper surface of the subgrade, shall be filled with broken limestone. . . . Any irregularities which may occur in the surface must be corrected as the work progresses and all depressions filled as above specified, rewatered and rolled until the surface is finished and consolidated to the proper grade and crown. Upon the foundation thus prepared shall be placed a binder course of 1½ inches in thickness and upon this binder course a wearing surface of two inches in thickness composed of Trinidad Lake asphalt."

The specifications relating to "detail Q" were as follows: "Subgrade is to be prepared as specified in "detail N" except that the excavation and new macadam of the foundation shall be brought to within three inches of the established cross section and grade of the street. Upon the subgrade thus prepared shall be placed a binder course of 1½ inches in thickness and upon this binder course a wearing surface of 1½ inches in thickness composed of Trinidad Lake asphalt."

The cross sections of "details N" and "Q" showed first a bed of old macadam, second, a layer of new macadam to bring the bed to the required height, third, the binder course and fourth, the wearing surface of asphalt. The only substantial difference between the two details was in the thickness of the surface course. Aside from what we have noted relating to subgrading, the plans and specifications contained in the blue print were silent on the subject of grading and appear to have been prepared to apply only to streets that had been paved with macadam laid to the established grade and which, therefore, required no grading for the new pavement except such subgrading as might be necessary to prepare a proper foundation for the binder and surface courses.

Counsel for plaintiff argue, in substance, that the resolution, in legal effect, at least, required that the proposed work of paving the street to its full width exclusive of sidewalks according to the specifications of "detail Q" included the grading necessary to bring the street to the established grade and that since such grading was done under a separate proceeding and at additional cost to the property owners, the tax bills in question must be held void under the rule that the work specified in the resolution must be the work contracted to be done or the tax bills will be void. [Trenton v. Collier, 68 Mo. App. 483; City of Boonville v. Stephens, 95 S. W. 314.] The charter of Kansas City in force at the time of the passage of the resolution in question (sec. 2, art. IX, Charter & Revised Ordinances, 1898) provided "that whenever the common council shall deem it necessary to pave . . . any street . . . and payment for such work and improvement is to be made in special tax bills, the common council shall, by resolution, declare such work or improvement to be necessary, stating the kind of paving material proposed to be used, and such resolution or the substance thereof, shall be published for ten

days . . . and unless the resident owners of the city
who own a majority in front feet of all the lands be-
longing to such residents and fronting on the street
. . . to be improved shall, within thirty days from
the first day of such publication file with the city clerk
a remonstrance, signed by them, against the proposed
improvement, then the common council shall have
power to cause the proposed improvement to be made
and to issue special tax bills therefor."

The passage and publication of such preliminary
resolution is jurisdictional. [City v. Bacon, 144 Mo.
App. 477; Coulter v. Construction Co., 131 Mo. App.
230; Paving Co. v. O'Brien, 128 Mo. App. 267; Kirks-
ville v. Coleman, 103 Mo. App. 215.]

The resolution is for the prime benefit of the own-
ers whose property is to be taxed to pay for the im-
provement and its publication calls on such property
owner to decide whether the work shall go on with
his consent or whether he shall file a remonstrance.
The resolution affords him an opportunity to be heard
on the subject of the necessity and wisdom of the pro-
posed improvement and, therefore, it is indispensable
that he should have accurate information. Should the
subsequent ordinance and contract for the improve-
ment deviate materially from the resolution the whole
proceeding will be void for the reason that the prop-
erty owners have been deprived of the right the law in-
tends they should have to be informed at the start
of the true nature of the improvement for which they
are to pay. Should we find that the resolution under
consideration told the property owners, in effect, that
the work of paving the street included all necessary
grading and that the entire work would be done at
a maximum cost of two dollars per square yard, we
would hold it would not support the subsequent pro-
ceedings ending in a contract which relieved the con-
tractor of the burden of grading.

174 Mo. App.—26

On the other hand if we should find that the resolution dealt only with the subject of paving a street already graded to the established grade and was not intended to include grading necessary to bring the street to such grade, we must hold the resolution sufficient. If the resolution for paving and the plans and specifications to which it refers are silent on the subject of grading the law will imply a duty on the part of the city to furnish a graded street to the contractor. [Hilgert v. Barber, 107 Mo. App. l. c. 388; Ash v. Independence, 79 Mo. App. 74.] And a property owner would not be justified in thinking that the burden of such duty was included in the work proposed by the resolution.

Turning to the resolution in hand we find it does not speak of grading but is confined to the subject of paving. Certainly a property owner reading it could not reasonably infer that the work of bringing the street to the established grade was intended to be a part of the improvement proposed by the resolution and if he had gone to the office of the city engineer and examined the plans and specifications to which he was referred, he would have discovered that they called for no grading except such subgrading as might be required to prepare a street already brought to the established grade for a new pavement to replace an old one. Further he would have discovered upon inquiry that a separate grading ordinance had been passed and would have known that the bidders for the paving would be asked to bid on the basis of a graded street. We do not sanction the argument that there was a vital variance between the resolution, ordinance and contract. They all relate to the same subject-matter, i. e., the paving of a street already brought to the established grade. The property owners could not have been misled and having been given a fair opportunity to object to the proposed improvement which afterwards was made, pursuant to the terms of the resolu-

tion, the legal object and purpose of the provision of the charter requiring the passage of a preliminary resolution was fully accomplished.

The ordinance for the improvement, as stated, was enacted December 21, 1903, and, after the passage of the grading ordinance, instead of having the effect of repealing the latter ordinance, was consistent with it and clearly advised property owners and contractors that the only work to be let was the paving of the street and that no other grading would be required of the contractor than the subgrading specified in "detail Q." Inasmuch as the old macadam did not cover the full width of the proposed pavement, the work to be done by the paving contractor as outlined in the ordinance and specifications necessarily included the work of subgrading the unmacadamized part of the proposed roadway to a depth admitting of the laying of new macadam to piece out the old macadam bed but it was not intended that the paving contractor should do any other grading at the sides of the old pavement. The grading required to bring those parts of the street to the established grade was to be done by the city in discharge of its implied duty to furnish a graded street to the paving contractor and had already been provided for in the grading ordinance. The ordinances for grading and paving being consistent with each other were valid expressions of the legislative authority of the city and since the property owners were fully advised in the manner provided by law of the true nature and scope of the proposed improvements, we perceive no ground upon which a just attack on the validity of the resolution and ordinance for the paving may be based.

It is argued that the contract for paving was not advertised and let within a proper time after the enactment of the ordinance. The first advertisement for bids was made about three months after the passage of the ordinance, but the grading had not been done and

no bid was filed. The contract was not let until August 30, 1904, eight months after the date of the ordinance and the question for determination is whether or not the ordinance had become spent and bereft of vital force at the time of the letting. Our decision in the case of City of Marshall to use v. Wisdom, 127 Mo. App. 460, is pointed to as an authority for the proposition that the ordinance had become invalidated by delay in proceeding under it. In that case the ordinance prescribed that "the work shall be completed within ninety days from the time the contract binds and takes effect." Bids were advertised for and the contract was let but for no disclosed or apparent reason eleven months were allowed to elapse before the contract was entered into. We held the jurisdiction of the city over the parties and subject-matter was a jurisdiction to proceed in the usual course of such matters and within the limits defined by law and that since time was made of the essence of the proceedings the law contemplated that there should be no unreasonable delay in entering into the contract after the letting thereof, since to permit such delay would tend to open the door to favoritism and fraud. But we are not confronted here with a question of unnecessary delay which serves to give the successful bidder unauthorized and unadvertised time to do the work and consequently gives him an unfair, secret advantage over other bidders, but with the question of whether or not a delay of eight months in letting the contract after the enactment of an ordinance which does not specify the time in which the work shall be done and, therefore, does not make time of the essence of the proceedings, *ipso facto,* and without regard for the peculiar circumstances of the case, robs the ordinance of all vitality.

The Supreme Court in Jaicks v. Middlesex Investment Co., 201 Mo. 111, holds that the failure of an ordinance to fix the time for the completion of the work

does not invalidate the ordinance and that "tax bills issued in payment of the work are not void because of long delay in letting the contract for the doing of the work, if the contract was in compliance with the ordinance and the work was done and completed in compliance with the contract."

Where it appears that after the passage of the ordinance the proposed improvement was abandoned the rule requiring the city to proceed in the usual course of such matters and without unreasonable delay would prevent the revivication of an abandoned proceeding, but so long as the delay in letting the contract is due to excusing causes and not to a purpose to abandon the improvement, no good reason can be given for holding the ordinance impaired by such delays which could not discriminate among bidders or give opportunity for fraud or favoritism. The evidence discloses not only that the street was not brought to the established grade until about the time of the final advertisement for bids but that a sewer was being constructed in it. These were sufficient reasons for postponing the letting of the contract and, doubtless, was the reason for the refusal of defendant to bid in response to the first advertisement. There was no unusual or unnecessary delay in letting the contract and the proceedings to that point were valid and operative.

Another point made by plaintiff against the tax bills that the proceedings were invalid because of the failure of the city engineer to file a preliminary estimate of the cost of the improvement is well met by the answer that the charter and ordinances of Kansas City in force at the time did not make the filing of such estimate a condition precedent to the enactment of the ordinance for the improvement or the letting of the contract. [Youmans v. Everett, 173 Mo. App. 671.]

There is no merit in the contention of plaintiff that the work was not completed in proper time. As

we have shown, the ordinance did not make time of the essence of the proceedings and, therefore, the duty imposed by law upon the contractor with respect to the time in which he should do the work was that he should complete the improvement within a reasonable time. The contract specified ninety days from September 12, 1904, the date of its confirmation as the time to be consumed in the work and prima facie that was a reasonable time, because the parties themselves agreed that it was. [Hund v. Rackliffe, 192 Mo. 1. c. 325.]    But as is said in the case just cited, "where, for any good reason shown, as the inability of the contractor to procure a portion of the materials necessary for the doing of the work, as appears in this case, the work cannot be completed within the contract time, it would be a narrow, strained, unnatural and unreasonable construction of the law to hold that the municipal assembly had not the power, during the life of the contract, to extend the time for the completion of the work; for such act of the municipal authorities would be a legitimate determination of what constitutes a reasonable time, and as no appreciable damages could thereby ensue to the property owner by the extension, the courts will not interfere with the legislative determination of the reasonableness of the time for the completion of the work."

The council within the life of the contract extended the time by ordinance to June 1, 1905. This declaration of the legislative body of the city that good cause existed for the extension must be given weight and should not be declared untrue except upon clear and convincing proof to the contrary. Turning to the record we find abundant justification for the action of the council in evidence of unfavorable weather and the prosecution of other work on the street. Under the charter and ordinances the council had authority to enact the extending ordinance in the absence of a recommendation from the board of public works.

Finally it is argued that the pavement constructed by defendant was wholly worthless. Many witnesses who resided on the street testified that in two years after its completion the pavement became badly out of repair but the great weight of the evidence sustains the action of the officers of the city in accepting the work as done in compliance with the terms of the contract.

The position of plaintiff is well answered in the following quotation from the opinion in Construction Company v. Coal Co., 205 Mo. l. c. 74:

"It is next insisted that the acceptance of the work by the city engineer was void, for different reasons. First, that the pavement was not of such quality that it would endure for five years from and after the completion of the work without the need of any repairs. Section 5 of the ordinance under which this work was done provides that "the work herein authorized shall be executed with a guarantee that the said pavement shall be constructed with such materials and in such a manner that the same shall endure without the need of any repairs for a period of five years after the completion and acceptance of the same without further compensation than that provided for in the contract for the first cost of such work, and for which the said special tax bills are issued." And the contract contains a similar provision. The evidence quite clearly showed that there were holes in the paving, both before and after it was finished; it also showed that the contractor relaid and repaired two or three of the blocks after the payment was put down. A guaranty of this character has been upheld by this court in Asphalt Paving Company v. Ullman, 137 Mo. 543; Seaboard National Bank v. Woesten, 176 Mo. l. c. 59, and cases there cited. The guaranty being good it does not mean that the pavement shall endure without any need of repairs for five years, but that it shall endure for that period without further compen-

sation than that provided for in the contract for the first cost of such work; in a word, it bound the contractor to repair the pavement from time to time and keep it in repair for five years without further compensation therefor. While the evidence shows there were holes in it, it also showed that it had been repaired, and had given good' satisfaction as a street.

If defendant breached its guaranty to keep the pavement in good repair it became liable on its bond to respond in damages but such breach could not affect the validity of the tax bills issued in payment of the cost of the pavement.

We have answered the principal attacks on the tax bills. In our opinion they are valid and the court erred in holding otherwise. The judgment is reversed. All concur.